Filed 5/31/24  P. v. Alas CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B323781 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA146403–04) |
| v. | |
| HENRY ALAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Laura R. Walton, Judge.  Affirmed.

Olivia Meme, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and Appellant Henry Alas appeals from a judgment of conviction for first degree murder. Alas argues the trial court erroneously admitted his coperpetrator's recorded hearsay statement made to an undercover informant under the statement against penal interest exception. Alas asserts the trial court abused its discretion by admitting the entire 140-page transcript without considering the context of each statement to determine whether they fell into the exception.

Alas also argues his conviction must be reversed after the passage of Penal Code[1] section 1109, which requires the trial court to bifurcate proceedings on gang enhancement allegations if requested by the defense. Alas asks us to apply the statute retroactively and to reverse his conviction, because he argues the highly inflammatory gang evidence here allowed the jury to convict him based on his gang history rather than evidence of the underlying murder.

Last, Alas argues his sentence of 25 years to life is grossly disproportionate to his role in the offense, his background, his personal characteristics, and the more lenient sentences meted out to his coperpetrators. Specifically, he asks us to exercise our authority to modify his conviction to second degree murder or manslaughter and resentence him accordingly.

For the reasons stated below, we affirm.

---

[1]    All further undesignated statutory citations are to the Penal Code.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.  The May 3 stabbing**

Alas, Giovanni "Stoner" Ibanez, Pedro "Stretch" Guzman, and Faustino "Cino" Bermudez are members of the "Down for Whatever" (DFW) gang.  DFW is a small, up and coming gang that operates in Compton within the territory of the Compton Varrio Setentas, a much larger and more established street gang with ties to the Mexican Mafia.  One of DFW's rivals is the White Street gang, whose territory is near DFW's.

On May 3, 2017, Alas, Guzman, and Bermudez encountered two men on the street, including Angel Zavala, a member of White Street.  The man who was with Zavala ran from the attack, but Zavala stood his ground, and stabbed Alas, Guzman, and Bermudez.  Alas and Guzman suffered non-life threatening stab wounds while Bermudez was seriously injured and required hospitalization.

That evening, Daniel Moran, who was a member of the Florencia 13 gang and a soldier for the Mexican Mafia, exchanged messages on Facebook with a woman.  Moran said Bermudez, Guzman, and Alas had been stabbed, and that Bermudez almost died and required hospitalization.  Moran described how he picked up Alas, Guzman, and Bermudez after the stabbing and drove them to the hospital.  Moran also indicated he had been searching for members of White Street since the attack.

On May 4, 2017, Alas exchanged Facebook messages with Stephanie H.  In their exchange, Alas said that he and another "homie" were stabbed, and that " 'my other homie in surgery.' " He told her, "yea babe I gotta do my shyt tho babe they got my nigga bad man im hot asf."  When Stephanie H. asked who stabbed him, Alas replied, " 'an [enemy] that I was beating up he

3

pop a knife after he got me.' " Alas then said, " [b]ut going to get it worse though straight leaving him dead.' " When she later messaged Alas that " 'You're not dying on me,' " Alas responded, " 'No babe I'm not. The foo dat did this . . . is going to die serio.' "

That same day, Alas and Ibanez messaged each other on Facebook. Ibanez said he heard Alas got stabbed. Alas explained he and Guzman had been stabbed by a "wkierd ass foo" and Bermudez " 'was doing bad' " in " 'surgery.' " Alas then wrote to Ibanez, "Pull up I'm triena go to White or see [Bermudez]." Ibanez responded, "We go wen I get out."

## II.    The May 6 shooting

On May 6, 2017, at about 9:43 a.m., Alas sent a message to Ibanez, asking him where he was located. Ibanez responded he was on Pannes Street with Moran and Guzman. Alas said, "Dats fishy" and "Ima pull u[p]." Ibanez responded, "Come out."

Approximately 40 minutes later, a witness heard three to four gunshots near the corner of White Avenue and Rose Street and saw a silver Nissan Maxima speeding away.

At 10:45 a.m., deputies for the Los Angeles County Sheriff's Department (LASD) responded to a report of shots fired on White Avenue. The deputies found Zavala on the sidewalk, suffering from three gunshot wounds, including a fatal gunshot wound to his neck. They also found four .40 caliber shell casings approximately 100 feet from Zavala's body, a fired bullet, and strike marks on a nearby fence.

Several days later, LASD detectives obtained surveillance recordings from nearby businesses that showed a silver Nissan Maxima leaving the scene of the shooting.

On the night of the shooting, Alas used a search engine on his phone to search for "Compton shooting."

4

On June 8, 2017, Alas, Moran, Guzman, Ibanez, and Bermudez were arrested in connection with the shooting of Zavala.  At Ibanez's home, investigators found a car matching the description of the car seen driving away from the shooting.  Ibanez's mother told investigators the car's keys belonged to Ibanez.

## III.   The *Perkins[2]* operation

After the arrests, Ibanez and Moran were brought to an LASD station in South Los Angeles.  Investigators placed Ibanez in a holding cell with a confidential informant.  The conversation was recorded.

The informant initiated a conversation with Ibanez, identifying himself as a gang member and asking Ibanez about the circumstances of Ibanez's arrest.  Ibanez explained he and several other people had been arrested by different law enforcement agencies.  The informant asked him, "Did you guys do something big, or what?"  Ibanez responded, "Nah.  Well, they just—they were talking about a shooting . . . , but I mean, I don't [know] what the fuck is going on."  The informant asked, "Did they tell you they arrested you for that or they arrested you for something else?"  Ibanez responded, "Well, that's what they were questioning us about, about the shooting."  Ibanez then explained how he was arrested and that law enforcement had searched his house.

Ibanez proceeded to explain how he was from a tagging crew in Compton known as DFW.  Ibanez and the informant discussed the possibility of someone cooperating with law enforcement since everyone was arrested at the same time.

---

[2]     *Illinois v. Perkins* (1990) 496 U.S. 292.

Ibanez was worried his friends would suspect he was the cooperator because he had been separated from the others and taken to a different station.  When the informant asked what Ibanez was being charged with, Ibanez responded, "No, I don't even know who got murdered, who—what happened."

At some point, investigators placed Moran in a cell near Ibanez.  Moran told Ibanez he was being charged with "gang conspiracy."

Investigators then took Ibanez out of his cell to question him.  They asked Ibanez about the murder and showed him pictures of his car leaving the scene.  When investigators placed Ibanez back in the cell, the informant asked Ibanez what the investigators told him.  Ibanez said, "About some murder . . . , that happened.  I don't know why the fuck they tryina [*sic*] involve me in that shit . . . .  They showed me pictures of my car."  Ibanez could see it was his car from the pictures.  Ibanez also said the investigators did not care about the shooter, they only cared about him, and Ibanez would be charged with the murder even if they never caught the actual shooter.

Ibanez told the informant he could explain his presence around the area of the shooting by telling investigators he was visiting a friend who lived in the area.  The following exchange then took place.

"[Informant]:  See, . . . what you're thinking is the way to fucking think.  I'mma tell you like this:  if me and you go do a [job] and we get a fucking way—and I get caught.  Say, for instance, like your situation, I'm the fucking driver, who are they gonna go for?

"[Ibanez]:  The driver, dog[.]

"[Informant]:  The fucking driver.  So, . . . the murder is gonna be solid on who?

"[Ibanez]:  On the driver.

"[Informant]:  On the driver, the person who was driving. If they got the shooter or not, or whoever was fucking involved, they don't give a fuck, because they know the driver's the one that drove them there.  You get what I'm saying?"

The investigators then took the informant out of the cell. When the informant returned, he asked Ibanez if he knew somebody named "Stretch," and suggested Stretch was cooperating with law enforcement.  Ibanez then admitted Moran was the shooter and Stretch was in the car.  When the informant asked Ibanez whether it was just him, Moran, and Stretch in the car Ibanez responded, "And another fool."

Ibanez explained Moran got out of the car when he shot Zavala.  Ibanez said he cleaned the car after the shooting and someone else cleaned the bullets in the gun before they were fired.  He also said that, after the shooting, they drove to someone's house where Moran showered and cleaned his hands.

When asked why Zavala was shot, Ibanez said Zavala was an enemy from another crew.  The informant explained to Ibanez he was asking about the motive because Ibanez could be charged with gang allegations.

Ibanez stated, "That fool, we got him 'cause he's the one that stabbed the homies.  [¶] . . . [¶]  He stabbed three of the homies."  The informant told Ibanez, "That's good for you!" because Ibanez could argue self-defense.

The informant asked what time the shooting occurred. Ibanez said it happened around 10:00 a.m.  The informant asked

Ibanez if they were searching for Zavala before the shooting. The following exchange then took place.

"[Ibanez]: Fool, but check it out, fool. Look, fool, at that—when we got him, we weren't.

"[Informant]: Ah.

"[Ibanez]: You know what I mean? Well it's 'cause, this fool—look, I'm gonna tell you how—the way it's going down, you know? 'Cause—so can you know, you know? If I don't tell you certain parts you're gonna be lost, you know? So—

"[Informant]: Yeah.

"[Ibanez]: So, this is basically what happened, fool: the homies ran up on the niggers like on some normal shit like we always run up on.

"[Informant]: Yeah.

"[Ibanez]: You know how we beef, you know?

"[Informant]: Yeah.

"[Ibanez]: But, I guess the homies ran up on the two fools, but one fool runs and only one fool stays and homies jump him and, it end up being the fool he jumped had a knife so—

"[Informant]: Oh shit.

"[Ibanez]: He stabbed three of the homies. But only one got like stabbed, like the fool that I told you got hit in the lung and I think he scratched his fucking rib. He was the one doing—he was doing, you know, in the hospital, like fighting for his life. Well, not really fighting 'cause he had made it quick, but he was the one like suffering type of shit. The other homies, they got like sliced, like you know, little cuts.

"[Informant]: Yeah, like cuts.

"[Ibanez]: It was deep but you know, like—

"[Informant]: Yeah.

"[Ibanez]:  Livable, you know?  And we were mad 'cause of that shit and that's why we were looking and you know, we're trying to retaliate and fucking—we were just on them fool like, keep going and going and then this one, when that thing happened we went to a gang of spots, fool.  And we didn't see them, you know?  And then we were like fuck it, we came back to the homie's pad and we were gonna go pick up the homie.  The homie lives on that block, on their block, on their main block, you know?  So we were gonna go pick up the homie and as we're going down a little street, like this, and this is the street where it happened.

"[Informant]:  Aha.

"[Ibanez]:  And—

"[Informant]:  What street was that?

"[Ibanez]:  It's called White.

"[Informant]:  White?

"[Ibanez]:  Yeah.

"[Informant]:  White.

"[Ibanez]:  That's the name of the hood—White.

"[Informant]:  Oh, okay.

"[Ibanez]:  But, they—it was this street, and we're coming like this, so we made a right 'cause the homie lives on the right side.

"[Informant]:  Aha.

"[Ibanez]:  And then the [enemies] be on this side.

"[Informant]:  Yeah.

"[Ibanez]:  So as soon as I make the right, the homie—the homies they're looking at the other way you now, they're like: 'Just in case.'

"[Informant]:  The motherfuckers are right there.

9

"[Ibanez]: Yeah.  And the homie's like: 'Hey, I think that's one of them.'  It's only one fool, but the homie said he didn't know who it was—it was just—it was just—he just seen a person, you know?  He just seen a body who looked—

"[Informant]:  Aha.

"[Ibanez]:  He like: 'I think it's one of them.'  And it ended up being the same nigger that got the homies.  And the homie got off and pa, pa, pa!

"[Informant]:  Damn!  That's right, fuck him.

"[Ibanez]:  Yeah, but . . . .

"[Informant]:  Did he . . . did that fool try to run?

"[Ibanez]:  Nah, he tried to run but got got.

"[Informant]: . . . Go on.  Payback's a bitch, huh?

"[Ibanez]:  We didn't even know, we didn't even know like where we hit him or nothing, we thought like, the homies thought that, it was like in his back and the leg—

"[Informant]:  Yeah?

"[Ibanez]:  But we ended up hitting the—he got shot in the neck, and it came somewhere like through his face and that fool's on life support and doing bad."

The informant then asked who had been arrested.  Ibanez said, "We all got busted.  All the ones that were there got busted.  And an extra homie too that wasn't there.  [¶] . . . [¶]  But he wasn't there when we did that shit.  [¶] . . . He was in the hospital."  The following exchange then took place.

"[Informant]:  So, let me tell you.  You were driving, then, right?

"[Ibanez]:  Yeah.

10

"[Informant]: And then, your homeboy from Florencia was the driver—the passenger? You were in the back and the homie that got stabbed was in the back?

"[Ibanez]: Yeah.

"[Informant]: So he watched that shit go down?

"[Ibanez]: Who?

"[Informant]: Uh, the homie that got stabbed?

"[Ibanez]: No, no, no. Well, yeah, two of the homies that got stabbed, seen—took the payback, but the homie that was— the one that was—the one that got stabbed more [seriously]—

"[Informant]: Right.

"[Ibanez]: He was still in the hospital.

"[Informant]: Oh, okay.

"[Ibanez]: So, he wasn't—he wasn't even around.

"[Informant]: Oh, I got it. So two—okay, the one that got stabbed bad, he was still in the hospital, but the one that got stabbed [not bad], he was with you . . . okay I got it. [And he's] Stretch?

"[Ibanez]: Yeah Stretch, and then the other homie, too."

The informant and Ibanez then spoke about matters unrelated to the shooting.

## IV. Jury verdict and sentencing

An information charged Alas, Moran, Ibanez, and Guzman with one count of murder (§ 187, subd. (a)). It was further alleged the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)), and a principal personally used and discharged a firearm, causing great bodily injury and death (§ 12022.53, subd. (b)–(e)(1)).

11

After Alas's trial was severed from his codefendants, a jury convicted him of first degree murder and found true the firearm and gang enhancement allegations.  At sentencing, the trial court dismissed the gang and firearm allegations, and sentenced Alas to a term of 25 years to life.

Alas appealed.

## DISCUSSION

### I. The trial court did not abuse its discretion in admitting Ibanez's statement to the *Perkins* agent

Alas argues the trial court erred by admitting Ibanez's entire statement to the *Perkins* agent without evaluating whether all of the statements were against Ibanez's penal interest.  Alas argues the trial court's decision to admit the entire transcript was an abuse of discretion because the trial court stated it did not review every page of the transcript.  He further argues the trial court abused its discretion when it admitted the entire statement merely because a few of Ibanez's statements were against his penal interest.

#### A. Governing law and standard of review

Hearsay is an out-of-court statement used to prove the truth of the matter asserted and is generally inadmissible unless an exception applies.  (Evid. Code, § 1200, subds. (a), (b).)  One exception to the hearsay rule is a declaration against the declarant's penal interests under Evidence Code section 1230.  (*People v. Chhoun* (2021) 11 Cal.5th 1, 42–43.)  "[T]he rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court

12

statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Grimes*, *supra*, 1 Cal.5th at p. 711.)

We review a trial court's ruling under Evidence Code section 1230 for abuse of discretion. (*Grimes*, *supra*, 1 Cal.5th at pp. 711–712.)

Our Supreme Court has interpreted the application of Evidence Code section 1230 in determining whether a coperpetrator's extrajudicial confession implicating another defendant in a crime was admissible as a statement against penal interest. (*People v. Leach* (1975) 15 Cal.3d 419, 428, 438 (*Leach*).) To the extent a confession contains collateral assertions inculpating the defendant, rather than the confessor, the statement is inadmissible. (*Grimes*, *supra*, 1 Cal.5th at p. 713, citing *Leach*, at pp. 441–442.) "[T]hose portions of a confession inculpating others are not as inherently trustworthy as those portions that are actually disserving to the declarant's interests." (*Grimes*, at p. 713.)

13

Nevertheless, our Supreme Court has explained that lower courts should "consider whether the portion of a confession that tends to exculpate another, rather than to shift blame or curry favor, should be admitted in view of surrounding circumstances, even though the exculpatory portion of the statement is not independently disserving of the declarant's interests." (*Grimes*, *supra*, 1 Cal.5th at p. 715.) "[T]he nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' " (*Id.* at p. 716.) "[S]uch a statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility, as in the example ' "I robbed the store alone," ' as opposed to attempting to assign greater blame to others, as in the example, ' "I did it, but X is guiltier than I am." ' " (*Ibid.*)

"Of course, not all such statements are admissible; sometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others. A member of a criminal street gang, for example, may choose to take the fall for fellow gang members by making a confession that exculpates them. A trial court in that situation may reasonably conclude that the declarant's incentive to protect his friends renders the exculpatory portions of the statement inadmissible. [Citation.]

14

But such a statement is not . . . automatically inadmissible merely because it does not render the declarant more culpable than the other portions of his confession—or because . . . the statement does not 'significantly enhance the personal detriment' to a person who has already confessed responsibility for the crime." (*Grimes*, *supra*, 1 Cal.5th at pp. 716–717.) In sum, "context matters in determining whether a statement or portion thereof is admissible under the against-interest exception." (*Id.* at p. 717.)

Evidence Code section 1230 therefore allows the admission of "portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Grimes*, *supra*, 1 Cal.5th at p. 715.) Ultimately, courts must consider each statement in context to answer whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest such that a reasonable person in the declarant's position would not have said it unless true. (*Id.* at p. 716.)

### B.    Analysis

Applying this contextual approach here, Ibanez's two statements identifying who was in the car during the shooting and suggesting that Alas was one of those individuals were against Ibanez's penal interests. His statements identified two other DFW members who were in the car, each of whom had been stabbed by Zavala several days earlier. His statements therefore placed him at the scene of the crime and provided a motive for Ibanez and his fellow DFW members to participate in the shooting. Further, Ibanez's statements did not minimize his role

15

in the crime.  When Ibanez spoke to the informant, he understood that, as the driver, he would be just as guilty as the shooter and knew law enforcement had already tied his car to the shooting.  We therefore disagree with Alas's contention that Ibanez's statement identifying Moran as the shooter was an attempt to minimize Ibanez's role or to shift blame.  (See, e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 120–121; *People v. Cortez* (2016) 63 Cal.4th 101, 128.)  Rather, Ibanez's statements incriminated him, Moran, and the other individuals in the car at the time of the murder.  (See, e.g., *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.)

Ibanez's statements identifying the individuals in the car, including Alas, were also inextricably tied to and part of a statement against his penal interest because he was explaining the circumstances of the shooting.  For example, in his statements, Ibanez admitted he was the driver, Moran was the shooter, and that Guzman and another DFW member were also in the car.  He explained that the shooting was in retaliation for Zavala stabbing three DFW members, including two who were present during the shooting.

Alas's reliance on *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*) does not convince us the trial court erred here.

In *Gallardo*, our colleagues in Division Seven found the trial court erred and abused its discretion in admitting the entire 40-page transcript of a declarant's conversation with undercover informants under Evidence Code section 1230.  (*Gallardo*, *supra*, 18 Cal.App.5th at p. 72.)  The *Gallardo* court found the trial court did not independently assess whether each statement implicating the defendants was in fact against the declarant's penal interest at the time he made it.  (*Ibid*.)  Rather, the trial court admitted

16

the entire transcript because it found certain details the declarant had provided to the informants regarding the crime showed his entire statement was sufficiently trustworthy to warrant its inclusion as a declaration against interest. (*Ibid*.) "The [trial] court's implied conclusion—in effect a decision that every statement [the declarant] made implicating his codefendants was sufficiently against his penal interest—cannot withstand scrutiny even under the deferential abuse of discretion standard." (*Ibid*.)

The *Gallardo* court proceeded to identify several factors that made the declarant's statement unreliable. (*Gallardo, supra*, 18 Cal.App.5th at p. 73.) It found unreliable those statements that followed questions by the confidential informants suggesting that something was a fact when that fact had not been first introduced by the declarant. (*Id*. at p. 73.) For example, the informants asked the declarant if one of the defendants was the shooter, although the declarant had never stated that was the case. (*Ibid*.) The problem was compounded when the informants asked questions that led the declarant to contradict his earlier statements. (*Ibid*.) The statements became even more problematic when the confidential informants suggested the declarant's role was minimal, asked leading questions designed to shift the blame to the defendants, and elicited a response minimizing the declarant's role and shifting the blame to others. (*Id*. at p. 74.) The *Gallardo* court emphasized the declarant had already implicated himself as a participant in the crime in an unspecified capacity when he identified other individuals as major participants, which "did little to increase [the declarant's] criminal culpability, and served primarily to 'minimize [his] role and place the blame . . . on [his] accomplice[s].' " (*Ibid*.)

17

Unlike *Gallardo*, the same indicia of unreliability are not present here. While Ibanez initially denied knowing anything about the shooting, after he was confronted with pictures of his car leaving the scene, he consistently described himself to the informant as the driver, Moran as the shooter, and the presence of the other DFW members who were also in the car.[3] These details were not fed to Ibanez by the informant through leading questions, rather, they were responses to the informant's open-ended questions about what had occurred. Nor was there any indication that Ibanez was trying to minimize his role in the shooting as he admittedly understood that the driver would be just as culpable as the shooter.

We are also not persuaded that *Gallardo* requires a reversal here based on the trial court's statement that it did not read the entire transcript. The *Gallardo* court's finding that the trial court abused its discretion in admitting the entire transcript

---

[3] There was one instance during Ibanez's conversation where the informant asked Ibanez multiple questions before getting a response. During the exchange, the informant asked, "So let me tell you. You were the one driving, then, right?" Ibanez, responded, "Yeah." The informant then asked, "And then, your homeboy from Florencia was the driver—the passenger? You were in the back and the homie that got stabbed was in the back?" Ibanez responded, "Yeah." This muddled exchange notwithstanding, Ibanez was consistent in his statements to the informant that he was the driver, Moran was the shooter, and two other DFW's were also in the car. Indeed, the compound nature of the question appears to be the informant correcting his own question in real time based on what Ibanez had already told him, which was then clarified by Ibanez shortly thereafter in a manner consistent with Ibanez's prior description of the shooting.

18

was merely support for its conclusion that the trial court failed to consider the declarant's statements in their full context, which was required before admitting them. Indeed, the *Gallardo* court focused its analysis on the declarant's affirmative responses to the informants' questions regarding the identities of the shooter and the driver. (*Gallardo*, *supra*, 18 Cal.App.5th at pp. 72–73.)

Here, the trial court reviewed the statements at issue, specifically, those statements identifying by inference Alas as one of the other passengers in the car, in the context of which they were made. In its motion to admit the statement and during the hearing on the motion, the prosecutor described the circumstances surrounding the statements at issue. The prosecutor explained that Ibanez was speaking to a confidential informant, Ibanez appeared to understand the driver would be as guilty as the shooter, Ibanez identified Moran as the shooter, and that Ibanez and the other persons in the vehicle had been searching for Zavala and other rival gang members to retaliate for the stabbing. Defense counsel did not challenge this representation, conceding the prosecutor had presented a "correct statement of the facts." Further, the prosecution's motion to admit the statement, which the trial court did review with the aid of the transcript, contained sufficient detail as to the context of the specific statements at issue, quoting extensively from the 140-page transcript.

To the extent Alas argues the trial court should not have admitted the entire 140-page transcript, that argument is forfeited. During the hearing, when the trial court asked whether the prosecutor intended to introduce the entire transcript, the prosecutor stated his belief that the entire transcript was admissible but was open to redacting large

19

portions that were unrelated to the incident.  Nothing in the record shows that defense counsel requested any redactions.  Therefore, we find any argument based on the admission of the entire transcript was forfeited.  (See, e.g., *In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

## II.    Section 1109 does not require reversal

Next, Alas argues his conviction must be reversed because section 1109, which became effective January 1, 2022, and requires the trial court to hold a bifurcated trial on the gang allegations if requested by the defendant, applies retroactively to his case.

Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) substantially changed the law governing gang-related offenses.  Assembly Bill No. 333 added section 1109, which allows the defense to request a bifurcated trial on gang enhancements.  (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.)  Under the statute, the defendant's guilt on the underlying offense must first be determined, and a trial on the gang enhancements is held only if the defendant is first found guilty of the underlying offense.  (§ 1109, subd. (a)(1)–(2).)

There is a split in authority on whether section 1109 applies retroactively.  The Supreme Court has granted review to resolve the issue.  (*People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743 [§ 1109 applies retroactively]; *People v. Perez* (2022) 78 Cal.App.5th 192, review granted Aug. 17, 2022, S275090 [§ 1109 does not apply retroactively]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, review granted Oct. 12, 2022, S275341 [same]; *People v. Boukes* (2022) 83 Cal.App.5th 937, review granted Dec. 14, 2022, S277103 [same]).)

20

Alas argues we should follow those line of cases that have held section 1109 applies retroactively. We find that taking a position on the issue is unnecessary here. This is because even if the statute applied retroactively, reversal would not be required.

Our Supreme Court has held that any error in failing to apply section 1109 is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Tran* (2022) 13 Cal.5th 1169, 1208–1209.)

Applying the *Watson* standard, we find any error in failing to bifurcate the gang allegations was harmless. This is because the most prejudicial gang evidence would have been admitted to prove motive for the shooting and Alas's participation. The gang evidence included that Alas and his coperpetrators were members of DFW, an up and coming gang trying to build its reputation within a much larger gang's territory. It also included the fact that Zavala was a member of a rival gang and helped explain the circumstances surrounding the stabbing that ultimately led to the shooting. There was also evidence that Moran was a member of Florencia 13 and a soldier for the Mexican Mafia. The gang expert explained that a member of an established gang like Florencia 13 could validate an up and coming street gang like DFW that was seeking to gain recognition and acceptance by the Mexican Mafia, which provided an additional motive for the shooting.

Thus, had the trial been bifurcated under section 1109, the only evidence that would have been properly excluded in proving the underlying murder would have been the predicate offenses, here, criminal threats and unlawful driving of a car, and DFW's primary activities, which were burglary, robbery, assault, criminal threats, vandalism, and narcotics sales. When

21

compared with the gang evidence that was admitted to prove motive and intent, the potentially inadmissible evidence to prove the gang allegations was not so inflammatory as to sway the jury to convict Alas regardless of his actual guilt of the underlying crime.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.)

Accordingly, we find any error in failing to bifurcate under section 1109 was harmless.  (*People v. Osband* (1996) 13 Cal.4th 622, 667.)

## III.   Alas's sentence was not cruel and unusual under the California Constitution

Alas argues we should exercise our authority to modify his conviction to second degree murder or manslaughter, because his sentence of 25 years to life is grossly disproportionate to his personal culpability, thus making it a cruel and unusual punishment in violation of the California Constitution.

### A.   Sentencing proceedings

Defense counsel submitted a statement in mitigation under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).  The statement included a psychological and intellectual assessment, which showed Alas had a low-average to borderline range of intelligence, suggesting "he could, to a mild degree, struggle some with keeping up with his peers intellectually, and utilizing abstract problem solving techniques."  It also concluded that Alas was "largely, raised in a stable home environment although there were some times when [the family] [was] struggling financially and utilities were off for a few days."  Although other family members reported conflicts with his father, Alas stated he had a good relationship with him, and that his father was not aggressive, violent, abusive, or in trouble with the law.

The assessment also found Alas struggled "to do well in school" and "had a tendency to associate with delinquent peers." It also noted that, while Alas "initially experienced few problems in school," he began demonstrating behavioral issues when he " 'started hanging out with an older group of bad actors' who he saw as 'older brothers.' " The assessment concluded, "although [Alas] denied experiencing any significant problems in the home it does appear there were conflicts and problems . . . especially after the parents divorced and his mother left. In addition, [Alas] has historically struggled to do well in school which testing confirm[ed]. [Alas's] home environment, and the learning limitations and problems in his schooling negatively affected his overall development."

With respect to the incident, "Alas noted . . . he was at the wrong place at the wrong time. He did admit he was associating with the 'wrong crowd.' " "In addition, the record shows he looked up to older delinquent friends as brothers." With respect to his interpersonal functioning, the assessment noted that Alas saw his friends as family and he did not care what was happening at home. However, he reported having a good relationship with everyone in his family and that he just "went down the wrong path in life."

The assessment concluded: "Given these findings it is respectfully recommended Mr. [Alas's] particular issues as well as the general *Franklin* factors which can affect a youth's planning, judgment, decisionmaking, the evaluation of future consequences, control of emotions, and the processing and inhibition of impulses be taken into consideration at [Alas's] next hearing."

After admitting the *Franklin* statement, the trial court sentenced Alas to 25 years to life.

## B.  Governing law and standard of review

"A punishment is cruel or unusual in violation of the California Constitution 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'  [Citation.]  Because it is the Legislature's function to define crimes and prescribe punishments, the judiciary should not interfere 'unless a statute prescribes a penalty "out of all proportion to the offense." ' "  (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).)

Our Supreme Court has explained that we should use certain " 'techniques' " to aid in determining proportionality, i.e., whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment.  (*People v. Dillon* (1983) 34 Cal.3d 441, 479 (*Dillon*).)  These include the nature of the offense and the offender, comparison of punishment for other crimes in California, and comparison of punishment for analogous crimes in other states.  (*In re Lynch* (1972) 8 Cal.3d 410, 425–427.)  Here, Alas only argues his punishment is cruel and unusual under the first factor, i.e., the nature of the offense and the offender.

## C.  Forfeiture

As an initial matter, we find Alas has forfeited any argument regarding whether his sentence was cruel and unusual because he did not make that claim at sentencing.  (See *Baker*, *supra*, 20 Cal.App.5th at p. 720 [cruel and unusual punishment claim is fact specific and forfeited if not raised in the trial court]; *People v. Johnson* (2013) 221 Cal.App.4th 623, 636.)

24

Nevertheless, we will reach the merits of Alas's argument to avoid his ineffective assistance of counsel claim.  (*People v. Em* (2009) 171 Cal.App.4th 964, 971, fn. 5 (*Em*).)

> **D.    Alas's sentence was not cruel or unusual considering the nature of the offense and the offender or in comparison to the sentences of his coperpetrators**
>
> **1.    The nature of the offense and the offender**

"Factors to consider in evaluating the nature of the offense include the seriousness of the offense and the presence of violence, victims, or aggravating circumstances.  [Citations.]  We consider not only the offense in the abstract but also the facts of the crime in question—'i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.'  [Citations.]  We also evaluate whether the punishment fits the *criminal*.  [Citations.]  We examine the defendant 'in the concrete rather than the abstract . . . focus[ing] on the particular person before the court, [to ask] whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' " (*Baker*, *supra*, 20 Cal.App.5th at p. 724.)

Alas was convicted of first degree murder, and the jury found true the gang allegations, as well as that a principal personally and intentionally discharged a firearm causing great bodily injury and death.  Intentional murder is one of the worst crimes under the Penal Code.  (See *People v. Edwards* (2019) 34 Cal.App.5th 183, 197; see also *People v. Ngo* (2023)

25

89 Cal.App.5th 116, 123.) It is undisputed that murder is a serious crime and that the use of a gun by a gang member in the commission of the crime presents a significant degree of danger to society. (*Em*, *supra*, 171 Cal.App.4th at pp. 972–973.)

Alas argues his involvement in the murder was minimal as he was merely present in the car, was unarmed, and did not know Moran had a gun. This is not supported by the record as there is additional evidence that Alas intended to kill Zavala in retaliation for the stabbing, and was also motivated to kill a rival gang member. These included Facebook messages, where Alas admitted he intended to kill the White Street member who stabbed him and was searching White Street's territory for Zavala. Further, life sentences for those convicted of aiding and abetting a murder pass constitutional muster. (*Em*, *supra*, 171 Cal.App.4th at pp. 972–973.)

Alas also argues his sentence was cruel and unusual given his age and other individual factors, including his admiration of his delinquent peers, the emotionally charged nature of the crime given Zavala had stabbed Alas and seriously injured Alas's friend, Alas's deficits in cognitive processing, his unstable home environment, and his lack of a violent criminal record.

These additional factors do not persuade us that Alas's sentence was cruel and unusual. First, although Alas was 18 years old at the time of the shooting, he was legally an adult and at the age where society draws the line for many purposes between adulthood and childhood. (See *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, citing *Roper v. Simmons* (2005) 543 U.S. 551, 574.) Thus, his sentence of 25 years to life was not cruel and unusual merely due to his age. (See, e.g., *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1218 [finding sentence of

26

life without the possibility of parole was not cruel and unusual for an 18-year-old offender convicted of first degree murder].)

Nor are we convinced by Alas's reliance on *Dillon*, *supra*, 34 Cal.3d 441, which found the defendant's life sentence was cruel and unusual considering the defendant's emotional and intellectual immaturity. In *Dillon*, the defendant was immature in several ways: "intellectually, he showed poor judgment and planning; socially, he functioned 'like a much younger child'; emotionally, he reacted 'again, much like a younger child' by denying the reality of stressful events and living rather in a world of make-believe." (*Id.* at p. 483.) That is not the case here. While Alas did demonstrate some intellectual and emotional deficits, he also chose to associate with known gang members, and to participate in the initial assault of Zavala, which set in motion the need to violently retaliate. He also stated his intent to kill Zavala because he was a rival gang member and an enemy, and searched for anyone in the rival gang's territory in order to violently retaliate against them.

### 2. Comparison with Alas's coperpetrators' sentences

Last, Alas argues his sentence was unconstitutional given the sentences of his coperpetrators.[4]

---

[4] Alas requested judicial notice of various court documents showing that: Moran was sentenced to 15 years after he pled no contest to voluntary manslaughter and admitted the firearm enhancement; Ibanez was sentenced to 15 years after a jury convicted him of second degree murder; Guzman was placed on formal probation after pleading no contest to being an accessory.

With respect to Alas's coperpetrators, who admitted guilt and pled no contest to lesser charges, their sentences are not properly comparable to Alas's sentence since they are the result of plea negotiations. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1159; *People v. Wilson* (2020) 56 Cal.App.5th 128, 169–170.) Further, while Ibanez received a lesser sentence, he was convicted of second degree murder in contrast to Alas, who was convicted of first degree murder. As discussed above, there was evidence that Alas intended to kill Zavala and was searching for him before the murder. Therefore, Ibanez's sentence is not a proper comparison given the jury found Alas acted with the intent to kill.

Accordingly, we find Alas's sentence was not cruel and unusual under the California Constitution and decline to exercise our authority to modify his conviction and sentence.

---

We deferred ruling on the request and now grant it. (See Evid. Code, § 452; *Duggal v. G.E. Capital Communications Services Inc.* (2000) 81 Cal.App.4th 81, 86.)

## DISPOSITION

The judgment is affirmed.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

WILEY, J.